| | | | |
|---|---|---|---|
| AO 91 (Rev. 11/11)  Criminal Complaint | AUSA: William M. Sloan | Telephone: (313) 226-9611 | |
| | Special Agent: Brady Rees (ATF) | Telephone: (313) 202-3400 | |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
   v.
DERRICK D. JACKSON,

     Defendant.

Case No.  Case: 2:21−mj−30215
Assigned To : Unassigned
Assign. Date : 5/7/2021
USA V. JACKSON (CMP)(CMC)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 4, 2021 to May 6, 2021__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Use of interstate commerce facilities in the commission of murder-for-hire |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Brady W. Rees, ATF
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: May 6, 2021

_____
Judge's signature

City and state: Detroit, Michigan

Hon. Kimberly G. Altman, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DERRICK D. JACKSON,<br><br>    Defendant. | Case No. |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR
CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Special Agent Brady W. Rees, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed since January 2016. I have had extensive law enforcement training, including at the Federal Law Enforcement Training Center in the Criminal Investigator Training Program and ATF Special Agent Basic Training. Prior to becoming an ATF Special Agent, I was a police officer with the City of Novi, in Michigan, for approximately three years. I also have a bachelor's degree in Criminal Justice.

2.  As an ATF Special Agent, I have participated in numerous criminal investigations, including investigations involving firearms, armed drug tracking, and criminal street gangs. I am familiar with, and have experience using, a variety

1

of investigative techniques and resources, including physical and electronic surveillance, undercover agents and various types of informants, and cooperating sources. I have authored numerous federal search warrants and federal criminal complaints, and I have participated in the execution of numerous search warrants and arrest warrants.

3. I submit this affidavit in support of a criminal complaint charging that, from on or about May 4, 2021 to on or about May 6, 2021, within the Eastern District of Michigan and elsewhere, the defendant, Derrick D. JACKSON (D.O.B.: XX/XX/1975), caused another to travel in interstate commerce, and used, and caused another to use, facilities of interstate commerce, with the intent that the murder of L.A. be committed in violation of the laws of the State of Ohio as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value, to wit: United States currency.

4. The facts and information set forth below are based on my personal observations and knowledge, as well as information provided by other law enforcement officers. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all details or facts known to me concerning this investigation.

## PROBABLE CAUSE

**I.    Background of Investigation**

5.    During the month of May 2021, law enforcement officers, including ATF agents and Detroit Police Department officers, have been investigating Derrick D. JACKSON in connection with a murder-for-hire plot. As set forth in more detail below, the plot has involved two in-person meetings between JACKSON and an ATF Special Agent acting in an undercover capacity (hereinafter "UC-1"). Those meetings were audio recorded. As part of the plot, JACKSON drove an automobile to and from meetings with UC-1 and caused UC-1 to do the same, and JACKSON used his cell phone to communicate with UC-1 regarding the murder plot and caused UC-1 to do the same. In addition, as part of the plot, JACKSON caused UC-1 to travel from Michigan to Ohio.

6.    I have reviewed JACKSON's Computerized Criminal History report ("CCH"), as well as publicly available records from the Third Circuit Court, Wayne County, Michigan, which reflected that JACKSON is a convicted felon. Specifically, in 2001 JACKSON was convicted of Second-Degree Murder and Felony Firearm. He was sentenced to 16 to 30 years for the murder count and two years for the firearm count.

7.    JACKSON was released on parole for the above offenses in February 2021 and he is being supervised by the Michigan Department of Corrections

3

(MDOC).  Recently, MDOC placed JACKSON on GPS tether monitoring due to a parole violation.

## II.     First Meeting, on May 4, 2021

8.      On or about May 4, 2021, UC-1 met with JACKSON in person in Detroit, Michigan.  Prior to the meeting, a third party had informed UC-1 that JACKSON was looking for a person to kill his girlfriend.

9.      On May 4, 2021, at approximately 1:10 p.m., UC-1 traveled in an automobile to the intersection of Concord Avenue and E. Warren Avenue in Detroit and parked his vehicle.  At approximately 1:38 p.m., JACKSON arrived at the location in a tan sedan and parked his car on Concord Avenue.  JACKSON was the driver and sole occupant of the car.  UC-1 then approached JACKSON's car on foot, and JACKSON exited the car, greeted UC-1, and identified himself as "Chop."

10.     UC-1 stated to JACKSON that he (UC-1) was aware that he (JACKSON) had some "work."  JACKSON replied in the affirmative, and UC-1 asked what it was.  JACKSON stated that it was "an ex-girlfriend of mine" that "took half a brick, twenty thousand [*dollars*][1] and sent me to prison.  I got this shit on my leg for two years."  JACKSON then showed UC-1 a GPS ankle monitor.

---

[1] Whenever used throughout this affidavit, information in brackets and italics reflects my explanation of slang and/or coded conversation, based on my training and experience and the context of the communications.

4

Based on my training and experience, I know that "brick" is street vernacular or slang used to describe a kilogram amount of narcotics.

11. UC-1 asked where "she" [L.A.] was located, and JACKSON responded, "She, she right there in Toledo [*Ohio*]." JACKSON then provided details about the intended victim's work schedule.

12. UC-1 then asked JACKSON what he wanted to be done to the intended victim, asking whether JACKSON wanted her "tuned up [*beaten up*] and your shit back, or do you want her gone [*killed*]?" JACKSON responded, "I done gave her an opportunity to give my shit back. I was gonna try one more time . . . but I'm tired of playing games. I been out since February." JACKSON further stated, "I'm a good dude but I can't move like I want to 'cause this shit on my leg [*referring to his GPS ankle monitor*]. You know, I get out of town, I get money. I do what I do. My thing was I did time . . . but if you don't get my, my shit, you gotta go."

13. UC-1 then asked JACKSON for specifics regarding the intended victim and stated that he (UC-1) needed to know what exactly JACKSON was trying to do. In response, JACKSON stated "I need to know how much you want." UC-1 stated that he would do "it" for "sixty-five [*$6,500*] up front and sixty-five after." JACKSON replied, "My thing is this, I just got out [*of prison*], you know what I'm saying, they gave me ten [*$10,000*] on my unemployment. I got about

5

seven, eight, I gotta go check this card right now. I got the card right here in my pocket." UC-1 then asked JACKSON what he would be "comfortable with as a down payment to help cover my expenses going down there." JACKSON immediately responded, "Five, about five [*$5,000*]." JACKSON then stated, "This is what I do. I know that when shit get put together they gonna come to me because she [*the intended victim*] got a PPR [*personal protection order*] on me." JACKSON then told UC-1, "I'm gonna be honest with you. I'm gonna give you five [*$5,000*], then I can make payments."

14. When UC-1 asked what total price JACKSON would be "cool" with "all together" for committing the murder, JACKSON replied "I'm cool with about, the most I'm gonna pay is about eleven [*$11,000*]." JACKSON then stated, "I do this type of work. This is what I do." When UC-1 responded, "Yeah but you don't want to go back [*to prison*]," JACKSON then stated, "I'm not gonna go back, you know what I'm saying. I'd rather for the bitch to give me my shit and get me the fuck on, but if she not gonna do that then she gotta pay."

15. UC-1 then asked JACKSON, "So what do you want me to do?" JACKSON responded, "Get her." Then UC-1 asked, "You want her gone?" And JACKSON replied, "I want her gone, gone."

16. UC-1 then asked, "When you want it done?" JACKSON replied, "ASAP." UC-1 asked JACKSON if he (JACKSON) wanted him (UC-1) to "raid

6

the house." JACKSON replied, "No, I just want you, as soon as she pull up she got a camera on the garage, I been doing my homework on her, she might have a Ring doorbell. All you gotta do is put the mask on and get her ass."

17. UC-1 then asked, "How do you want it done?" JACKSON responded, "I just want head shots, just quick. I want you to tell her 'this from Chop.'" JACKSON continued, "So she'll know, this what you did. She didn't have to do that shit."

18. UC-1 then told JACKSON that he (UC-1) would drive to the area of the intended victim's residence and "check it out" before agreeing to do the "job." JACKSON agreed and provided UC-1 with the intended victim's address. When UC-1 asked if JACKSON had a photo of the intended victim, JACKSON stated that he did but it was in his phone. JACKSON then located the Facebook social media page of the intended victim on UC-1's cell phone and confirmed a photo of the intended victim as "her." JACKSON then stated, "She easy to get, it's easy. It's so easy."

19. When UC-1 asked what the intended victim's residence looked like, JACKSON described the residence. UC-1 then told JACKSON that he (UC-1) would "check it out" and get back to JACKSON about whether or not he (UC-1) would agree to complete the murder. JACKSON agreed.

20. UC-1 then asked for a partial payment to cover his expenses while he traveled to Toledo, Ohio, to "check out everything." JACKSON agreed. JACKSON then gave UC-1 $100 in cash as a payment for UC-1 to travel to Toledo and do reconnaissance for the murder.

21. JACKSON and UC-1 agreed to speak again once JACKSON had verified the address of the intended victim. JACKSON then departed in his car.

### III. Phone Call on May 4, 2021

22. Later the same day, on May 4, 2021 at approximately 5:19 p.m., JACKSON called UC-1's cell phone. During the recorded conversation, JACKSON verified the intended victim's address in Toledo, Ohio.

23. JACKSON and UC-1 agreed to speak again once UC-1 returned from Toledo to Detroit. When UC-1 asked JACKSON how long it would take him to get the "down payment on the car," using coded language to refer to the initial payment for the murder, JACKSON replied, "Shit I got it now on the car."

### IV. Interstate Travel and Phone Call on May 5, 2021

24. On or about May 5, 2021, UC-1 traveled to Toledo, Ohio, by automobile and traveled to the vicinity of the intended victim's address, which JACKSON had provided. While in Toledo, UC-1 used his cell phone to call JACKSON. JACKSON answered the phone call, confirmed the intended victim's address, and agreed to give UC-1 a $2,000 down payment the following day.

### V.  Phone Call on May 6, 2021

25. On or about May 6, 2021, at approximately 12:30 p.m., JACKSON called UC-1's cell phone. During the conversation, JACKSON stated that he was only able to pay $1,600 to UC-1 when they met that day. UC-1 agreed to accept the smaller sum as an up-front payment and agreed to meet JACKSON later in the day.

### VI.  Second Meeting, on May 6, 2021

26. On or about May 6, 2021, at approximately 1:26 p.m., UC-1 met with JACKSON in person in a parking lot on Gratiot Avenue in Detroit. During the meeting, JACKSON provided UC-1 with $1,600 cash as a down payment for the planned murder.

27. UC-1 asked, "So you said the two quick 'boom, boom'" while making a firearm shape out of his hand. JACKSON replied, "However you want to do it, I just want her dead." UC-1 then asked if JACKSON wanted him (UC-1) to say anything to the intended victim, to which JACKSON immediately replied, "Just say 'this from Chop.' I want her to know, this, this what you did, you know what I'm saying, so. Yeah, I'll take care of my end man."

## CONCLUSION

28. Based on the foregoing, I respectfully submit there is probable cause to believe that, from on or about May 4, 2021 to on or about May 6, 2021, within the Eastern District of Michigan and elsewhere, the defendant, Derrick D. JACKSON, caused another to travel in interstate commerce, and used, and caused another to use, facilities of interstate commerce, with the intent that the murder of L.A. be committed in violation of the laws of the State of Ohio as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value, to wit: United States currency.

_____
Special Agent Brady Rees
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____
Hon. Kimberly G. Altman
United States Magistrate Judge

Dated: May 7, 2021